# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **LISA M. RUSSELL,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:06CV00041 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | By: James P. Jones |
| **COMMISSIONER OF SOCIAL** | ) | Chief United States District Judge |
| **SECURITY,** | ) | |
| | ) | |
| Defendant. | ) | |

*Vernon M. Williams, Wolfe, Williams & Rutherford, Norton, Virginia, for Plaintiff; Sara Bugbee Winn, Assistant United States Attorney, Roanoke, Virginia, for Defendant.*

In this social security case, I affirm the final decision of the Commissioner.

I

Lisa M. Russell filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") pursuant to Titles II and XVI of the Social Security Act ("Act"). 42 U.S.C.A. §§ 401-433, 1381-1383(f) (West 2003 & Supp. 2007). Jurisdiction of this court exists pursuant to 42 U.S.C.A. § 405(g).

My review under the Act is limited to a determination as to whether there is substantial evidence to support the Commissioner's final decision. If substantial evidence exists, the court's "inquiry must terminate," and the final decision of the Commissioner must be affirmed. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.*

The plaintiff applied for DIB and SSI on May 15, 2002, alleging disability beginning October 11, 2001, due to cervical radiculopathy, lumbar and sacral radiculopathy, high blood pressure, degenerative disc and joint disease, anxiety neurosis, and depression. (R. at 97, 109.) This claim was denied on October 23, 2002 (R. at 73-75), and upon reconsideration on February 17, 2003 (R. at 77-79).

On April 21, 2003, the plaintiff filed a request for a hearing before an administrative law judge ("ALJ"). (R. at 80.) A hearing was held on July 9, 2003. (R. at 557-76.) The plaintiff, who was present and represented by counsel, testified at the hearing. (*Id.*) By decision dated July 16, 2003, the ALJ denied the plaintiff's claim for DIB and SSI. (R. at 46-60.)

The plaintiff then filed a request for review with the Social Security Administration's Appeals Council ("Appeals Council") on July 22, 2003. (R. at 44-

-2-

45.)  Subsequently, the Appeals Council vacated the decision of ALJ in an order dated June 30, 2004, and remanded the case back to the ALJ for further proceedings. (R. at 85-88.)

A second hearing was held before the ALJ on December 29, 2004.  (R. at 577-91.)  By decision dated February 4, 2005, the ALJ again found that the plaintiff was not disabled within the meaning of the Act. (R. at 19-34.)  On July 6, 2006, the Appeals Council denied the plaintiff's request for review, and the ALJ's second opinion constitutes the final decision of the Commissioner.  (R. at 8-10.)  The plaintiff then filed a complaint with this court on August 3, 2006, objecting to the final decision of the Commissioner.

The parties have filed cross motions for summary judgment and have briefed the issues.  The case is now ripe for decision.


II

The summary judgment record reveals the following facts.  The plaintiff was thirty-six years old at the time of the ALJ's decision, making her a younger individual under the Commissioner's regulations. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c) (2007).   She has a high school education and last worked as a childcare provider in

August 2001. (R. at 110, 115.)  Her past work experience includes sewing machine

operation and clothes tagging and hanging. (R. at 110.)

The plaintiff has a history of back, neck, and shoulder pain.  In April 1997, she

sought treatment for these conditions from her primary care physician, Ben Norton,

M.D.[1]  Treatment initially consisted of physical therapy and pain medication.  (R. at

144, 147.)   Dr. Norton reported in his treatment notes that the plaintiff was

improving. (*Id.*)

Lumbar spine X rays performed on July 27, 1999, showed signs of early

degenerative disease.  (R. at 186.)  A CT scan of the lumbar spine obtained on July

29, 1999, suggested the presence of mild posterior disc bulges but without any disc

protrusion or herniation.  (R. at 185.)  A September 14, 1999, X ray of the right

shoulder yielded normal results. (R. at 184.)

Dr. Norton referred the plaintiff to Galen Smith, M.D., an orthopedic surgeon,

who the plaintiff first saw on November 1, 1999. (R. at 187.)  In his report of this

visit, Dr. Smith noted that the plaintiff complained of right shoulder and lower back

pain.  (R. at 188.)   He diagnosed her with bilateral ganglion cysts on the dorsum of

each wrist and recommended physical therapy and a continuation of her pain

---

[1]  The record indicates that the plaintiff was treated by Dr. Norton beginning in 1992.
(R. at 176.)  However, it appears that she was not treated for the conditions at issue until
1997.  (R. at 160.)

medication. (*Id.*) He further stated that although the plaintiff had mild degenerative disc bulges, they were not "pathologic enough to prevent her from making good improvement." (*Id.*)

Indeed, after receiving physical therapy from First Step Rehabilitation, the plaintiff returned to Dr. Norton and admitted modest improvement as a result of the therapy. (R. at 144-45.) She also consistently reported to her physical therapists that the therapy was helping with her pain. (R. at 190-202.)

Mohammed A. Bhatti, M.D., was the plaintiff's treating neurologist beginning in November 2000. (R. at 203-26.) Dr. Bhatti conducted EMG/nerve conduction studies on November 16, 2000, that indicated mild to moderate L4-L5 nerve root irritation. (R. at 226.) Dr. Bhatti also ordered X rays and MRI images of the lumbar spine performed on November 29, 2000, that indicated desiccation of the L3-L4 and L4-L5 discs with mild bulging, and a protrusion at L5-S1. (R. at 224-25.) A May 14, 2001, MRI of the plaintiff's cervical spine showed very mild bulging of the disc at C4-5 but no disc herniation at any of the levels. (R. at 223.) At an appointment on July 11, 2002, the plaintiff told Dr. Bhatti that the medication was helping her pain. (R. at 210.)

On October 11, 2001, Dr. Bhatti completed a Medical Report for General Relief, Medicaid and Temporary Assistance for Needy Families. (R. at 222.) In this

report, Dr. Bhatti opined that the plaintiff's diagnoses of cervical radiculopathy, lumbosacral radiculopathy, and anxiety neurosis rendered her permanently unable to work or severely limited her capacity for self-support for thirty days or more. (R. at 222.) He also stated that she could not be self-supporting even with treatment and that he recommended surgery when her condition deteriorated. (*Id*.)

Dr. Bhatti also completed medical evaluations for the Commonwealth of Virginia Department of Social Services on December 4, 2001, and February 7, 2002. (R. at 218-19, 216-17.) Dr. Bhatti indicated that the plaintiff had limitations in her ability to lift, sit, stoop, climb, use a keyboard, handle small items, bend, stand, walk, drive, and reach, and that the plaintiff could not place items less than five pounds on shelves higher than her head. (R. at 216, 218.) Although Dr. Bhatti noted in the December report that the plaintiff was not restricted in her ability to participate in a job search, job skills training, education, or job readiness training, and that her diagnosis of cervical radiculopathy did not keep her from caring for her children, he stated that he had advised the plaintiff to quit her job, reduce her work hours, or take a leave of absence for health reasons. (R. at 218-19.) In this report, he failed to respond to a question that asked whether the plaintiff could participate in employment. (R. at 219.) In his February report, Dr. Bhatti noted again that the plaintiff could participate in a job search, job skills training, education, or job

readiness training, but this time he answered that she could not participate in employment. (R. at 217.)

The plaintiff continued to see Dr. Bhatti for neck and back complaints for the remainder of 2002 and into 2003. Dr. Bhatti also ordered an MRI of the plaintiff's right shoulder that revealed tendonitis and a possible rotator cuff tear. (R. at 206.)

Dr. Bhatti referred the plaintiff to Nathan Doctry, M.D., another orthopedic surgeon. Dr. Doctry ordered an MRI of the plaintiff's cervical spine that showed spurring at C4 that was causing slight narrowing of the spinal canal. (R. at 246.) An MRI of the thoracic spine conducted on January 15, 2003, yielded "[e]ssentially negative examinations." (R. at 247.) The only abnormality detected by the thoracic spine MRI was a slight irregularity at multiple end plates with minimal anterior wedging of mid-thoracic vertebra. (*Id*.) Dr. Doctry also obtained MRIs of the plaintiff's knees on February 5, 2003, that showed no significant abnormalities. (R. at 244-45.) Nevertheless, Dr. Bhatti reviewed these MRIs and diagnosed the plaintiff with severe osteoarthritis of both knees. (R. at 204.) Dr. Bhatti also indicated in his notes that Dr. Doctry had recommended that the plaintiff have arthroscopy done on both knees, but she reported to Dr. Bhatti that she was skeptical about this procedure. (*Id.*)

-7-

Beginning in April 2001, the plaintiff began receiving her primary medical care from Zaka Khan, M.D. Dr. Khan treated the plaintiff for pain, anxiety and depression. (R. at 227-55, 299-303, 358-61.) On October 19, 2001, Dr. Khan completed a Medical Report for General Relief, Medicaid and Temporary Assistance for Needy Families. (R. at 238.) In this report, Dr. Khan opined that while the plaintiff's diagnoses of degenerative joint disorder and depression rendered her temporarily unable to work, depending on her response to pain management therapy, she could be self-supporting. (*Id.*) He also noted in a write-up of her May 12, 2003, visit that there was a possibility that the plaintiff was seeking secondary gain.[2] A few months later, the plaintiff complained to Dr. Khan of pain in her right wrist, but Dr. Khan was unable to detect any significant abnormalities in either his examination or in subsequent X rays. (R. at 358, 360.)

Howard Leizer, Ph.D., a state agency physician, reviewed the plaintiff's files in October 2002, and completed a psychiatric review technique form indicating that the plaintiff suffered from anxiety. (R. at 261-76.) However, Dr. Leizer reported that the plaintiff's activities of daily living, her ability to maintain social functioning, and her ability to maintain concentration, persistence and pace were only mildly affected.

---

[2] Secondary gain refers to social advantages that can be gained indirectly from having an illness, such as increased attention or assistance from others. *Compact American Medical Dictionary* 408 (Houghton Mifflin 1998).

-8-

(R. at 271.) He further noted that the plaintiff cared for her two sons, cooked, cleaned, washed dishes, drove a car, took herself to the doctor, shopped for groceries, and cared for her finances and insurance claims, and that she had no difficulty with understanding, memory or concentration. (R. at 275.) Consequently, he stated that the plaintiff's pain allegations were only partially credible. (R. at 276.) He also listed her impairment as "[n]ot [s]evere." (R. at 261.) In writing his report, Dr. Leizer did not take into account the plaintiff's records from outpatient psychiatric treatment she received from mental health professional Deidra Fisher Taylor, since he was unable to obtain these records despite repeated requests. (R. at 275.)

Gary Parrish, M.D., another state agency physician, conducted a Residual Physical Functional Capacity Assessment on October 22, 2002. (R. at 277-84.) In this report, Dr. Parrish indicated that the plaintiff could lift twenty pounds occasionally, ten pounds frequently, stand and/or walk for six hours out of an eight-hour work day, sit for six hours, and engage in unlimited pushing and pulling. (R. at 278.) He also suggested that the plaintiff had occasional postural limitations and some manipulative limitations. (R. at 280.) Dr. Parrish stated that he was relying on the minimal findings of the various medical tests ordered by Dr. Khan and Dr. Bhatti, namely, the lack of herniation or disc protrusion in the lumbar spine and the merely slight narrowing of disc space and mild bulging in the cervical spine. (R. at 278-

284.) He also noted that based partially on her admitted activities of daily living, the plaintiff's pain allegations were not fully credible. (R. at 283.) While he agreed with Dr. Khan that the plaintiff could not do heavy lifting at that time, he disagreed with Dr. Bhatti's finding that the plaintiff was disabled and remarked that such a determination is reserved for the Commissioner. (R. at 284.)

Upon referral by Dr. Khan, the plaintiff was evaluated on November 18, 2002, by Dr. Syed Zafar Ahsan, M.D., a psychiatrist. (R. at 285-88.) After evaluating the plaintiff and reviewing medical records received from Dr. Khan, Dr. Ahsan opined that the plaintiff did not appear to have acute symptoms of anxiety or depression. (R. at 287.) Dr. Ahsan also suggested that the plaintiff may be seeking secondary gain in order to obtain disability, based on the plaintiff's expressed concern about her lack of income. (R. at 286-87.) Dr. Ahsan diagnosed the plaintiff with an adjustment disorder with mixed emotional features, a generalized anxiety disorder, and nicotine dependence. (R. at 288.) He prescribed sleeping and anxiety medications, encouraged the plaintiff to minimize social interactions to avoid unnecessary stressors, and noted that the plaintiff would be referred to a local therapist once she had responded favorably to medication. (*Id*.)

In June 2003, the plaintiff began seeing Harold Schultz, D.O., for her pain complaints. (R. at 308-10.) Dr. Schultz completed physical assessments of the

-10-

plaintiff's ability to do work-related activities on June 30, 2003, and again on December 1, 2003. (R. at 308-10, 350-52.) In both reports, Dr. Schultz stated that the plaintiff could lift five pounds frequently, ten to fifteen pounds occasionally, but that her ability to stand, walk, and sit were affected by her alleged complaints. (R. at 308-09, 350-51.) He also noted that most of the plaintiff's postural abilities and many of her physical functions were affected by her alleged conditions. (*Id*.)

Dr. Schultz also signed a mental assessment of the plaintiff's ability to do work-related activities that was completed by mental health professional Taylor. (R. at 305-07.)[3] In this report, Taylor indicated that the plaintiff had a fair ability to make occupational adjustments[4] and a fair ability to make personal-social adjustments, but that she was restricted in her ability to make performance adjustments. (*Id.*)

Dr. Schultz referred the plaintiff to Scott MacDonald, M.D., a specialist in neurology and psychiatry, for a consultation on September 29, 2003. (R. at 347-48.)

_____

[3] The ALJ reviewed this assessment in making his initial decision and did not afford it significant weight because he found that it was not supported by any treatment notes or objective medical findings. (R. at 52.) When requesting that the Appeals Council review the ALJ's initial decision, the plaintiff included a mental medical assessment form and a treatment plan that had been completed by Taylor after the initial decision. (R. at 349-55.) The Appeals Council remanded the case in large part to allow the ALJ to consider this new evidence and to assess the severity of the claimant's mental impairments. (R. at 86-87.)

[4] Overall, Taylor rated the plaintiff's ability to make occupational adjustments as "fair." However, she did note that the plaintiff had a "good" ability to follow work rules, but that her ability to maintain attention and concentration was "poor/none." (R. at 305.)

-11-

Dr. MacDonald conducted another EMG/nerve conduction study that yielded "[e]ssentially normal" results. (R. at 348.) The plaintiff returned on October 8, 2003, and Dr. MacDonald noted that the plaintiff had full motor strength and normal pinprick in her arms. (R. at 356.)

The plaintiff received counseling from Taylor on November 6, 2003, and December 8, 2003. (R. at 349, 383-91.) Taylor recorded the plaintiff's major complaints, including decreased ability to cope, decreased attention, concentration and memory, decreased psychosocial skills, and increased depression and anxiety. (R. at 349.) After the first visit, Taylor recommended biweekly individual psychotherapy, suggested that the plaintiff's physicians consider putting her back on Xanax, and set forth various treatment goals. (*Id*.) The records of the plaintiff's second visit indicate that Taylor found that the plaintiff's response to treatment was "good" and that her progress toward treatment goals was "average." (R. at 390.)

Taylor also completed two assessment of the plaintiff's mental capacity to do work-related activities. (R. at 353-55, 438-39.) In the second assessment dated October 22, 2004, nearly a year after she last saw the plaintiff, Taylor opined that, as a result of the plaintiff's major depression and anxiety, she had poor to no ability

-12-

to make most occupational adjustments, performance adjustments, or personal-social adjustments. (R. at 438-39.)[5]

In 2004, the plaintiff's pain specialist Dr. Schultz referred the plaintiff to rheumatologist, Ghaith M. Mitri, M.D., due to the plaintiff's complaints of muscular pain, particularly in her arms. The plaintiff first saw Dr. Mitri on July 30, 2004. (R. at 392-93.) Dr. Mitri's initial impression was that the plaintiff had possible unspecified connective tissue disease. (*Id*.) Dr. Mitri noted that while the plaintiff reported tenderness to touch all over her body, the plaintiff experienced no weakness. (*Id.*) Dr. Mitri ordered X rays that revealed mild disc space narrowing in the thoracic spine, but no problems in her hands, wrists, knees, or right shoulder. (R. at 394-99.)

The plaintiff did not return to Dr. Mitri until November 4, 2004. (R. at 436-37.) Progress notes reveal that the plaintiff missed prior appointments. (R. at 436.) Dr. Mitri's November report noted diffused pain throughout the body, possible fibromyalgia, mild osteoarthritis, but no suggestion of connective tissue disease. (*Id*.) Dr. Mitri recommended continued medication therapy and suggested physical therapy, and counseling and information regarding possible fibromyalgia. (*Id*.) The plaintiff was then discharged from Dr. Mitri's care. (*Id*.)

---

[5] Taylor did indicate that the plaintiff had a fair ability to follow work rules, relate to co-workers, understand and carry out simple job instructions, and maintain her personal appearance. (R. at 438-39.)

-13-

On August 12, 2004, the plaintiff had a psychological consultative examination with Kathy J. Miller, M.Ed.[6] Robert S. Spangler, Ed.D, then reviewed Miller's results and signed the report. (R. at 375-82.) Miller noted that the plaintiff was alert and oriented and that her mood and affect were within normal limits. (R. at 377.) She further stated that the plaintiff appeared emotionally stable and of normal intelligence, her speech was normal, she maintained good eye contact, and was able to complete simple math problems quickly and correctly. (*Id.*) The report indicated that although the plaintiff had had vague suicidal ideation and crying spells in the past, the plaintiff's response to medication and counseling eliminated suicidal ideation, decreased her crying spells, improved her mood, anxiety, and sleep. (R. at 378.) Miller also noted that the plaintiff performed several activities of daily living. (R. at 377-78.) Miller concluded that the plaintiff suffered from a mild dysthymic disorder that was in good pharmacological control. (R. at 378-79.) She further opined that the plaintiff's prognosis was "good" and that she appeared to gain good benefit from formal mental health intervention. (R. at 379.)

---

[6] When remanding the case, the Appeals Council had directed the ALJ to obtain additional evidence concerning the plaintiff's mental impairments. (R. at 87.) The ALJ then ordered this psychological consultative examination that was conducted by Miller and Dr. Spangler. (R. at 588.)

In November 2004, Rebecca Mullins completed a medical evaluation for the Virginia Department of Social Services. (R. at 441-42.) Mullins stated that the plaintiff's primary diagnosis of fibromyalgia and secondary diagnosis of degenerative disc disease rendered the plaintiff unable to work in any capacity for an anticipated duration of greater than ninety days. (R. at 441.) Additionally, Mullins noted that the plaintiff was limited in her ability to lift objects greater than eight pounds, to bend over, stoop down or reach for objects, to sit for greater than one hour at a time, to stand for greater than one hour at a time, and to walk for distances greater than fifty feet. (R. at 442.)

In her second request for review filed with the Appeals Council, the plaintiff attached a physical assessment of her ability to do work-related activities. This report was completed by Mullins on May 9, 2005. (R. at 13-14.) Mullins noted in this report that the plaintiff's diagnoses of degenerative disc disease, disc space narrowing, and fibromyalgia, impaired her ability to lift or carry, stand or walk, and sit. Mullins also reported that the plaintiff had many postural, physical, and environmental restrictions. (*Id.*)

Mullins then completed a second medical evaluation for the Virginia Department of Social Services on July 28, 2005, that was forwarded to the Appeals Council. (R. at 465-66.) This July 2005 evaluation was identical to the November

-15-

2004 evaluation, except that this time Mullins indicated that the plaintiff could not lift objects greater than five pounds. (R. at 466.)

The plaintiff also provided the Appeals Council with Mullins' treatment notes for the period beginning November 19, 2004, through May 9, 2005. (R. at 468-72.) These notes indicate that the plaintiff was treated for the following conditions and complaints: degenerative disc disease, generalized anxiety disorder, muscle spasms in the neck and lower back, hypertension, gastroesophageal reflux disease (GERD), panic attacks, family planning, scoliosis, osteoarthritis, and fibromyalgia. (*Id.*)

Between December 19, 2005, and January 11, 2006, Steven Krein, M.D., treated the plaintiff for left knee pain. (R. at 458-61.) Dr. Krein noted in his report that the plaintiff's left knee showed no evidence of effusion or synovitis but that there was some tenderness to palpation at the anterolateral and midlateral joint line. (R. at 458.) Dr. Krein indicated that there were no other areas of tenderness and that sensation and circulation were intact. (*Id.*) X rays of both knees were obtained on January 6, 2006, and revealed a minimal medial joint space narrowing in the left knee but no indication of other bony or soft tissue abnormalities. (*Id.*) An MRI of the left knee obtained on January 11, 2006, showed mild cyst formation but no underlying tear or meniscal tears were detected. (R. at 461.)

-16-

Finally, the plaintiff received primary medical care from James Bryston Winegar, M.D., beginning on August 11, 2005. (R. at 474-84, 546-47, 555-56.) He treated her for the following complaints and conditions: hypertension, esophageal reflux, osteoarthritis, synovitis, lumbar disc degeneration, cervical spondylosis, myalgia and myositis, adjustment disorder with anxiety and depressed mood, nicotine dependence, left knee joint pain, lower back pain, fibromyalgia, jaw pain, chronic musculosketelal pain, neck pain, swelling of the hands, arthritis pain, atypical chest pain, and palpitations. (*Id.*)

## III

The plaintiff bears the burden of proving that she is under a disability. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). The standard for disability is strict. The plaintiff must show that her "physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C.A. § 423 (d)(2).

The Commissioner applies a five-step sequential evaluation process in assessing DIB and SSI claims. The Commissioner considers whether the claimant:

-17-

(1) has worked during the alleged period of disability; (2) has a severe impairment; (3) has a condition that meets or equals the severity of a listed impairment; (4) could return to her past relevant work; and (5) if not, whether she could perform other work present in the national economy. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2007). If it is determined at any point in the five-step analysis that the claimant is not disabled, then the inquiry immediately ceases. *See id.*; *Bowen v. Yuckert*, 482 U.S. 137, 141-42 (1987).

My review is limited to a determination of whether there is substantial evidence to support the Commissioner's final decision, and whether the correct legal standard has been applied. 42 U.S.C.A. § 405(g); *see Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). If substantial evidence exists, the final decision of the Commissioner must be affirmed. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotations omitted). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws*, 368 F.2d at 642. It is the role of the ALJ to resolve evidentiary conflicts, including inconsistences in the evidence. It is not the role of this court to substitute its judgment for that of the Commissioner, as long as substantial evidence provides

Case 2:06-cv-00041-JPJ-PMS   Document 18   Filed 09/28/07   Page 18 of 26   Pageid#: 93

a basis for the Commissioner's decisions. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

In reaching his decision that the plaintiff was not disabled within the meaning of the Act, the ALJ rejected the opinions of Dr. Bhatti, Dr. Schultz, Taylor, and Mullins. The plaintiff contends that the ALJ erred in his decision because he did not properly reject these opinions. Therefore, the first issue in this appeal is whether the record supports the ALJ's decision to disregard the findings of these treating health professionals.

Generally the opinions of treating sources are given more weight in reaching a disability determination. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2007). However, a treating source's opinion is entitled to controlling weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record . . . ." §§ 404.1527(d)(2), 416.927(d)(2). The opinion must also be about the nature and severity of the impairment. §§ 404.1527(d)(2), 416.927(d)(2).

The regulations outline several factors that an ALJ is to consider when weighing a medical opinion. Among those factors are: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of examination; (3) the nature and extent of the treatment relationship; (4) the degree to

which evidence supports the opinion; (5) the consistency of the record as a whole; (6) the specialization of the physician; and (7) any other factors that tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(d)(1)-(6), 416.927(d)(1)-(6); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996.)

In the three years that Dr. Bhatti treated the plaintiff, his treatment consisted of recording her subjective complaints, reviewing objective medical tests, prescribing medication, referring her to other doctors, and completing evaluations and reports. (R. at 203-26, 294-98.) Despite the fact that the EMG/nerve conduction studies, and several MRIs ordered by Dr. Bhatti all revealed mild to moderate results (R. at 223-26, 244-47), he indicated in disability reports that the plaintiff had severe restrictions (R. at 204, 216-22). Thus, the ALJ properly rejected the opinion of Dr. Bhatti because the objective evidence failed to support the restrictions he indicated. Dr. Parrish, one of the state agency physicians, similarly noted in his report that Dr. Bhatti's opinions were not supported by objective clinic evidence. (R. at 284.)

Because Dr. Schultz's opinion is also not supported by his own treatment notes or positive clinical findings, the ALJ properly rejected it. (R. at 308-10, 350-55, 363-70, 419-32.) The treatment notes of Dr. Schultz, the plaintiff's pain management specialist, are limited and reveal that his treatment consisted only of recording the plaintiff's complaints, prescribing her medication, referring her to a rheumatologist,

-20-

and completing disability reports. (*Id.*) As the defendant correctly observes, the only significant notation in Dr. Schultz's notes is that the plaintiff experienced tenderness on palpation of her cervical and lumbar spine. Dr. Schultz also indicated that he was concerned about the plaintiff's marijuana usage and that she was in danger of being dismissed from the pain program as a result. (R. at 366, 421.)

While Dr. Schultz co-signed a disability report with mental health professional Taylor stating that the plaintiff had major depression disorder, generalized anxiety disorder, and poor to no ability to maintain attention and concentration, neither he nor Taylor documented any positive clinical mental findings. (R. at 305-07.) Instead, in that same report they indicated that the plaintiff did have a fair ability to make personal-social and occupational adjustments. (R. at 306.) They further reported that the plaintiff had a fair ability to follow simple job instructions. (*Id.*)

The plaintiff also argues that the ALJ did not properly weigh the opinion of Dr. Khan in determining whether she is disabled. However, as the ALJ correctly observed, Dr. Khan stated in his own notes that he thought the plaintiff could be self-supporting with proper treatment and that there was the possibility that the plaintiff was seeking secondary gain. (R. at 25, 227, 238.)

I find that the ALJ also properly evaluated the opinions of mental health professionals Taylor and Mullins. In rejecting Mullins' opinion that the plaintiff was

-21-

unable to work, the ALJ noted that a decision as to whether a claimant is unable to work is reserved for the Commissioner. (R. at 29.) Because Mullins' opinion is not supported by the objective medical evidence, her own treatment records or narrative statement, the ALJ properly rejected it. (R. 441-42, 468-72.)

Taylor's opinion is also belied by her treatment notes. In her reports of the two treatment sessions she had with the plaintiff, Taylor notes that the plaintiff was oriented, appropriately groomed, and cooperative, that she displayed good eye contact, normal speech, and goal-directed thought content, and that she had appropriate affect, intact judgment, normal cognitive functioning, and intact, recent, immediate, and remote recall. (R. at 384, 389.) Furthermore, in her second visit with the plaintiff, Taylor noted that the plaintiff's response to treatment was "good" and that her progress toward treatment goals was "average." (R. at 390.) Yet, despite these findings, Taylor indicated in a disability report written a year after the plaintiff's last session, that the plaintiff had poor to no ability to make most occupational adjustments, performance adjustments, or personal-social adjustments. (R. at 438-39.) In short, because Taylor's disability report was written almost a year after her last session with the plaintiff, following only two treatment sessions, and was inconsistent with her own clinical findings, the ALJ properly rejected it.

-22-

The plaintiff also contends that the ALJ's residual functional capacity determination is not supported by substantial evidence. (Pl.'s Br. Supp. Mot. Summ. J. 27.) She further argues that the ALJ did not "assess [her] limitations, restrictions, and/or work related abilities on a function-by-function basis, as required." (Pl.'s Br. Supp. Mot. Summ. J. 28-29.)

However, it is clear from the record that the ALJ concluded that the plaintiff retained a residual functional capacity to perform sedentary and light work only after he considered all of the plaintiff's symptoms, including pain, the objective medical evidence and other evidence, the medical opinions of acceptable medical sources that reflect judgment on the nature and the severity of the impairments and resulting limitations, and all of the plaintiff's restrictions, limitations, and work-related abilities. (R. at 24-31.)

In determining the plaintiff's residual functional capacity, the ALJ reviewed the evidence regarding both physical and mental limitations. As to the plaintiff's physical limitations, the ALJ noted that the objective medical evidence indicated that the plaintiff had disc disease but no herniated discs. He also observed that the plaintiff's blood pressure was under control with medication, she had not required any aggressive treatment or hospitalization due to pain, and had not suffered any side

-23-

effects from her medication. He listed the numerous objective medical tests that yielded normal to mild results. (R. at 29.)

While the ALJ considered the plaintiff's subjective allegations, he also relied on the plaintiff's self-reported activities of daily living in determining that she was not disabled within the meaning of the Act. The plaintiff indicated that she regularly took care of her children, did the laundry and household chores, went grocery shopping, driving, and visiting, and attended school meetings. The ALJ also concluded that the plaintiff's credibility was undermined by her failure to stop smoking, her failure to keep several medical appointments, and her failure to participate in physical therapy and aquatic and aerobic exercise classes as recommended by Dr. Mitri. (*Id.*) Additionally, the ALJ noted that his conclusion that the plaintiff could perform light or sedentary work was consistent with the opinions of the state agency physicians who had performed a residual physical functional capacity assessment. (R. at 28-29, 277-84.)[7]

In determining the plaintiff's mental limitations, the ALJ relied in part on the assessment conducted by Miller that was signed by Dr. Spangler. (R. at 27-28.) Miller examined the plaintiff after the case was remanded back to the ALJ for further

_____

[7] The assessment was conducted by Dr. Parrish, but Randall Hays, M.D., another state agency physician reviewed all the evidence and signed the assessment as well.

-24-

proceedings to determine the extent of the plaintiff's mental limitations and indicated in her report that the plaintiff had "good" capacity to make occupational adjustments. (R. at 380-81.)

The ALJ also considered the fact that the plaintiff had not required hospitalization for emotional problems and had not sought ongoing professional health treatment. (R. at 27.) He noted that the plaintiff's credibility was also undermined by evidence of marijuana usage and positive urine drug screening. (R. at 28.) Finally, the ALJ indicated in his analysis that he was relying on the opinions of Dr. Ahsan, a treating physician, and Dr. Leizer, another state agency medical consultant. (R. at 28.) In particular, Dr. Ahsan had noted that the plaintiff might be seeking secondary gain and that she did not appear to have acute symptoms of anxiety or depression. (R. at 28, 287.)

Furthermore, during the second hearing, the ALJ asked the independent vocational expert whether a person with a residual physical functional capacity for light and sedentary work activities that had an emotional disorder with restrictions like those identified in the report written by Miller and Dr. Spangler would be able to perform any jobs in the national economy. (R. at 588-89.) The vocational expert was also to assume that this hypothetical woman was of the plaintiff's height, weight, education and work background. (*Id.*) In response, the vocational expert stated that

Case 2:06-cv-00041-JPJ-PMS   Document 18   Filed 09/28/07   Page 25 of 26   Pageid#: 100

this hypothetical woman would be able to perform the plaintiff's prior work, as well as several other potential jobs that he identified. (R. at 589.)

In short, I find that the ALJ properly weighed the treating physicians' opinions and that the ALJ's residual functional capacity assessment is supported by substantial evidence.


## IV

For the foregoing reasons, the plaintiff's Motion for Summary Judgment will be denied, and the Commissioner's Motion for Summary Judgment will be granted. An appropriate final judgment will be entered affirming the Commissioner's final decision denying benefits.

DATED: September 28, 2007

/s/ JAMES P. JONES
Chief United States District Judge